**PARKER AND CARMODY, LLP**
ATTORNEYS AT LAW
30 EAST 33RD STREET
6TH FLOOR
NEW YORK, N.Y. 10016

DANIEL S. PARKER                                                                            TELEPHONE: (212) 239-9777
MICHAEL CARMODY                                                       FACSIMILE:  (212) 239-9175
CHRISTINA S. COOPER                                                  DanielParker@aol.com

February 10, 2021

Hon. Nelson S. Roman
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re: **United States v. Max Nieves**
**19 Cr 402 (NSR)**

Dear Judge Roman:

       I write on behalf of Max Nieves ("the defendant" or "Mr. Nieves" or "Max") in advance of his sentencing currently scheduled for February 25, 2021.  Max, who turned 22 years old on December 16, 2020, asks the Court to impose a sentence of Time Served to be followed by a period of post-release supervision.  In the Pre-Sentence Report (PSR) dated April 7, 2020, the Probation Department recommended a sentence of 36 months, a downward variance from the sentencing guidelines.  We appreciate that recommendation and concur with much of the underlying justification supporting it set forth at pages 19-21 of the PSR.[1]

       Importantly, there are significant reasons that compel a further downward variance that were not addressed at the time the PSR was prepared, nor could they be.  One such factor in Mr. Nieves' favor is the significant progress he has made while incarcerated in the past year under extraordinary conditions. Although his recent progress hit a few minor bumps in the road, those minor issues are readily understandable given the issues discussed below.  Max's progress, including his mood stabilization now that he is finally on appropriate medication, will be detailed below.  The second significant factor which supports a further variance is that the conditions of incarceration as a result of the pandemic have been so harsh and severe, that the Court would be well within its province in considering them when imposing its sentence.  As a result of the rampant and uncontrollable spread of COVID in the Metropolitan Detention Center (MDC)[2], Mr.

---

[1] There is one supplemental objection to the PSR.  On page 14 in paragraph 76, and as referenced again on page 20, despite what Mr. Nieves may have told Probation during the Pre-Sentence Interview, we believe that Mr. Nieves first used marijuana at age 12 not at age 9.

[2] As of this writing, the BOP reports that there are currently 54 COVID positive inmates in the

1

Nieves has not been able to see his young children in nearly one year, he has not been able to receive psychiatric counseling that he needs, he has not been able to go to school or take classes in the past eight months or more, and he has spent much of the last year locked in a cell for 23 hours a day.  Conditions such as these are so contrary to his basic human dignity that we submit they provide a compelling basis for a further variance. The last factor that was not addressed in the PSR is that Mr. Nieves suffers from asthma and remains at risk should COVID continue to spread within any BOP facility where he would be required to serve an additional period of incarceration.  While correction officers choose whether or not to wear masks in the MDC despite rules requiring them to do so, and as COVID seeps into the facility from outside the prison walls and spreads like the plague that it is once inside, Mr. Nieves is overcome with feelings of dread and depression as he lies in his cell waiting to be sentenced. He asks counsel, "Do I have to get COVID and die to get out of here?"

## I.     PRELIMINARY STATEMENT

Max Nieves has led a life marred by tragedy, suffering, and dysfunction. As will be explained and documented in more detail below, his criminal actions relate to his mental illness which has been exacerbated by a multitude of circumstances.  At an early age, he was diagnosed as bi-polar.  He suffers from an unspecified mood disorder with psychotic features.  He has been treated for years, both in-patient and out-patient for his mental illnesses.  His biological father abused him.  His mother's boyfriend molested him. His mother was murdered when Max was 13 years old; her body discovered in a garbage bag in a dumpster. He was raised by his maternal grandmother until she was incarcerated on narcotics related charges.  It was at that point that his Aunt Minerva Slade became his guardian and caregiver.  To this day, Max calls her "mom."  His grandmother subsequently passed away in 2018.

Ms. Slade, a caring and compassionate Aunt, has devoted the past nearly 15 years to trying to help Max overcome his demons and his miserable and dysfunctional childhood. Currently, she has her own health issues, including debilitating chronic asthma as well as having undergone a hip replacement and gall bladder surgery, both within the past few years, which have taken her away from being the care-giver able to devote all of her time to Max.

Perhaps the best thing that Max has going for him is that he is in a long-term, stable relationship with Samantha Roman and together they have two toddlers, Noah, age 4, and Justin, age 3.  Not only has Ms. Roman been a positive influence in Max's life, but so has her family, including her mother and sisters.  They have become the family support network which provides Max with the love that he never had from his biological parents.

---

MDC, 239 "recovered" inmates, and no inmate deaths.  Over the past year, the BOP has been far from candid with respect to its COVID statistics and protocols. Confirmed reports late last week reveal that an inmate at the MDC died of COVID – but the BOP appears to be denying that tragedy. See https://www.bop.gov/coronavirus (last visited February 7, 2021).

Max is only 5'1" tall which causes him to try to appear bigger and tougher than he is in an effort to prevent himself from getting victimized. His diminutive stature not only leaves him vulnerable on the streets, but it leaves him particularly vulnerable in prison. Combined with his mental health issues, his false bravado persona resulted in his acting out in prison, being constantly ridiculed and abused by guards in the Westchester and Orange County jails, and frequently punished for his outbursts and behavior. During his incarceration in this case, he has had more than 15 reported violations, many of which occurred when he was not on medication, not thinking clearly, acting out in order to get himself removed from general population and/or responding to correction officers who taunted him.

The most significant development relating to Max occurred after he was moved to the Metropolitan Detention Center on March 16, 2020.  In or about mid-April, Max was prescribed a new medication and he has received psychiatric counseling while at the MDC prior to the restrictions put in place as a result of COVID. Since his incarceration at the MDC and prior to COVID prison restrictions, Max had made significant progress in both his outlook and in his behavior.  Since being transferred to the MDC, Max has only had very minor disciplinary incidents. Most recently, given the severe COVID restrictions, Mr. Nieves has begun to decompensate. It is clear that his untreated mental health issues and the insidious conditions in the MDC have resulted in fear, frustration and feelings of dehumanization.[3]

Prior to the COVID lockdowns that have kept Max in his cell for 23 hours a day for days on end for weeks on end for months on end, Max had started working in his unit, serving food to other inmates and cleaning up.

A forensic psychologist, Dr. Eric Goldsmith, evaluated Max at counsel's request and prepared a report dated July 28, 2020, attached hereto as Exhibit A,[4] which we submit provides valuable insight into Max' past, present condition and future prognosis.

At page 8 of his report, Dr. Goldsmith writes:

> During the early part of his incarceration Max Nieves had several infractions resulting in his placement in the SHU. Max Nieves was not being prescribed psychiatric medication. He was evidencing aggressive manic mood symptoms, paranoia, distressing auditory hallucinations and psychotic agitation consistent with a bipolar mood disorder diagnosis. However, *with a change in the jail and the initiation of psychiatric treatment, Mr. Nieves*

---

[3] A recent example of the toll that prison conditions have taken on Max is that he is only permitted out of his cell every three days to take a shower. Recently, a prison guard threatened to deprive him of his chance to shower. He got into an argument with the officer and was placed in the SHU.

[4] Given the nature of the report and the material contained therein, we respectfully request that it be filed under seal. We have redacted the report from the public filing of this sentencing submission.  In addition, Dr. Goldsmith reviewed extensive medical and school records which we are not attaching, but if requested, we will make available.

3

*has made significant improvements in his behavior with a reduction in psychiatric symptoms. His mood has normalized. He is less paranoid and evidences better impulse control. He has developed insight into his psychiatric problems and is participating in jail based psychiatric treatment. Mr. Nieves is engaging in more productive activities and is motivated to participate in prison based vocational skill building programs.* (emphasis added)

## II.    THE PLEA AND GUIDELINES

### A.  The Conduct in this Case

Max was charged with transferring a handgun to another individual on April 2, 2019, knowing that the individual was a juvenile and that the juvenile intended to use the handgun to commit an attempted assault in the second degree in violation of 18 U.S.C. § 922(x)(1)(A) and 924(a)(6)(B)(iii).

In connection with this incident, Max shot at and wounded another young man in the leg and handed the firearm to a young girl who was with him.  Notably, the individual who Max shot was also armed, had threatened Max, was subsequently arrested by the police for possession of a firearm on that day, was prosecuted by either Federal or State authorities, and was detained at the Westchester County Jail ("WCJ") in Valhalla where Max was also initially detained upon his arrest.  Though not a justification for his actions, this is not a case involving an "innocent" victim.

On January 31, 2020, Max pled guilty before Your Honor to his criminal conduct as charged in Count 1 in accordance with a Plea Agreement.

### B.  Mr. Nieves' Guideline Calculation

As set forth in the Plea Agreement and as confirmed in the PSR, Mr. Nieves' guidelines were calculated as follows:

a.  The applicable Guidelines manual is the manual effective November 1, 2018.

b.  The Guidelines Sections applicable to the offense are USSG § 2K2.1(c)(1)(A), 2X11, 2A2.2. Because the defendant used or possessed a firearm in connection with the commission or attempted commission of another offense or transferred a firearm with knowledge or intent it would be used in connection with another offense, USSG § 2X1.1 applies.

c.  Pursuant to USSG § 2X1.1(a) the base offense level is the guideline for the substantive offense. Because the defendant used the firearm to commit or attempt to commit aggravated assault and transferred the firearm to a juvenile who committed an aggravated assault, the base offense level is 14, pursuant to USSG § 2A2.2(a).

4

    d.  Because a firearm was discharged, the offense level is increased by 5 levels, pursuant to USSG § 2A2.2(b)(2)(A).

    e.  Because the victim sustained serious bodily injury, the offense level is increased by 5 levels, pursuant to USSG § 2A2.2(b)(3)(B).

    f.  Because the substantive offense, aggravated assault, was successfully completed, no further adjustments pursuant to USSG § 2X1.1 are appropriate.

    g.  Assuming the defendant clearly demonstrates acceptance of responsibility, and because of his timely notification of doing so, a three-level reduction is warranted, pursuant to USSG § 3E1.1(a) and (b).

    h.  In accordance with the above, the applicable Guidelines offense level is 21.

Mr. Nieves is in Criminal History Category III and faces a guideline range of 46-57 months.

## C. Probation Recommends a Downward Departure

Probation recommends a sentence of 36 months.

The PSR at page 20 notes:

> "It is evident that the defendant possesses violent tendencies that may be exasperated by his untreated mental health condition.  Throughout the presentence interview Nieves presented as paranoid and at times inappropriate.  Nieves is a young male with three violent felony convictions and severe mental health issues.  Unless he obtains significant mental health treatment it is highly likely that the defendant will continue to engage in violent behavior.
>
> …While we believe there are mitigating factors to warrant a variance in this case such as the defendant's age, mental health history, and family responsibilities, we also believe that a custodial sentence would serve to reflect the seriousness of the offense and afford adequate deterrence to criminal conduct.  We believe that the defendant needs to be sentenced to a term of imprisonment to deter other individuals who are tempted to engage in similar behavior.  We believe that 36 months' imprisonment would be sufficient, but not greater than necessary, to comply with the factors to be considered in imposing a sentence outlined in 18 USC 3553(a)…"

### D. A Further Variance is Warranted

Although we greatly appreciate the recommendation of Probation, which was made in its final report dated April 7, 2020, at the time of its recommendation certain mitigating factors were not known to Probation and other mitigating factors had not yet presented themselves.

Specifically, Probation was not fully aware of the extent of Max's mental health history and how it impacted his behavior. It could not have been aware of the progress that Max has made since April of last year as a result of medication, counseling, and maturity. In addition, when Max was interviewed on February 21, 2020 in the Orange County Jail and when the PSR was prepared on March 13, 2020, the conditions at the local jails, the MDC and other BOP prisons as a result of the COVID-19 pandemic were just beginning to present immediate dangers to inmates – including Max who suffers from asthma and uses an inhaler[5] – but the BOP's response and the resultant conditions of incarceration have since proved to be bordering on the inhumane. For a young man with a bi-polar disorder, the harshness of his conditions of incarceration have left Max feeling isolated, despondent, disconnected from his family, frustrated with his inability to participate in programs, and, most recently, anxious given his vulnerability to COVID.

For many, many weeks during the past 9 months, Max has been locked in a cell for as much as 23 hours a day, had limited access to common space, has been prevented from access to educational and other programs, and has been prevented from having any visitors, including his family. By the time he is sentenced, he will not have seen his children for approximately one year. There have been periods when he could not place telephone calls and longer periods where he did not receive any psychiatric counseling, could not take educational classes, was not permitted to work within the prison, or engage in basic recreation. Currently, as COVID rages inside the MDC, Max is locked in a cell 23 hours a day and he is allowed out to shower once every three days. He reports feeling as if he is being "treated as a dog, locked in a cage." He lives in fear and suffers from depression as inmates get sicker. Knowing that he is asthmatic heightens his anxiety and contributes to a pervasive sense of foreboding.

Without casting blame on who is responsible for these horrid prison conditions, they are a reality and border on the inhumane. At the very least, these conditions of confinement are so deplorable that the Court should consider the impact that they have had on a person whose psyche is compromised by mental illness. If the Court were to impose a sentence of Time Served, including a condition of home confinement, Max, would be able to substantially avoid the perils of COVID, be with his young children and their mother, participate in counseling (even if remotely) and be given the opportunity to regain his sense of dignity.

---

[5] As previously noted, and as documented in the bail application submitted by Mr. Nieves back in April 2020 (Dkt. No. 16), BOP medical records confirm that Mr. Nieves suffers from asthma, has been provided with an albuterol inhaler, and that he is directed to use it up to four times per day).

Judges in this District have considered the effects of COVID-19 in regard to the perils of the disease to inmates such as Max as well as the impact that the disease has had on incarcerated inmates such that granting a further variance is reasonable here. *See United States v. Capalbo*, 02 Cr 1237 (Preska, J.)(in a *Davis* re-sentencing proceeding, sentencing the defendant to Time Served in light of defendant's health conditions and COVID [Dkt No. 482]); *United States v.Carillo-Berber*, 18 Cr 703 (Crotty, J.)(court considered conditions of confinement in departing downward[Dkt. No. 28]); *United States v. Rivera*, 16 Cr 66 (Torres, J.)("… three months during COVID is different from three months in normal times…"); *United States v. Pierson*, 14 Cr 855 (Swain, J.)(court considered conditions of confinement at MDC during pandemic as one of the reasons for imposed Time Served); *United States v. Morgan*, 19 Cr 209 (Berman, J.)(Court imposed sentence less than one-half of the low end of the guidelines, based in part on conditions at MDC during pandemic); *United States v. Cirino*, 19 Cr 323(Rakoff, J.)("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); and others, including, *United States v. Aracena De Jesus*, 20 Cr 19 (Engelmayer, J.), in which the Court said:

> "Finally, I am mindful… that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. I'm mindful that you may have contracted COVID-19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close." (Sent. Tr. at 36:10-18)
>
> "Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December." (Sent. Tr. at 37: 6-11).

We submit that the ongoing peril to a vulnerable inmate such as Max along with the unforeseeable and harsh conditions of confinement which he has had to endure, provide a further justification for this Court to hold that Max has suffered under truly extreme and deplorable conditions of imprisonment – which for a person with mental health issues, like Max, have been even harsher -- and thus, the Court should depart below Probation's sentence recommendation in the PSR – made at a time when no one foresaw what has now come to bear.

### III. WHO IS MAX NIEVES

#### A. Max's History and Mental Health Condition

Max Nieves is a young man, born in the Bronx, NY, to the consensual union of Israel Nieves, age unknown, and Jennifer Martinez, deceased. Max has lived most of his life in

northern Westchester, but for about 4-5 years when he resided in the Bronx. He reportedly has twelve paternal siblings and three maternal siblings. He cannot recall the names and ages of any of his siblings with the exception of one maternal sibling.

Max reported that his father was not around much as he was physically abusive to both him and the defendant's mother. He would reportedly hit the defendant with an open hand. Max last had contact with his father "about a year ago."

Max's mother was murdered when she was 29 years old, when Max was 12 or 13 years old. He has very few memories of her because he was initially raised by his paternal grandmother, Anna Rivera until he was seven years old. It was then that police "raided" that home because his mother and grandmother were involved in the sale of narcotics. At the time, Max was taken by Child Protective Services who released him to the care of his aunt, Minerva Slade, now age 68. Since that time, Ms. Slade has been the defendant's primary care giver. The defendant refers to as his mother.

When Max's mother was murdered in Florida, her body was found in a garbage bag in a dumpster. Ms. Slade points to that event as one of the turning points in his life. She believes that Max's mental condition deteriorated after that and he developed serious and persistent problems.

According to Max, Mr. and Mrs. Slade always tried to keep him out of trouble, but as he told Probation in the Pre-Sentence Interview, he chose to go to "the streets" not because he had to but rather "the voices in his head made him not want to follow the rules." See PSR ¶ 48.

As set forth in Exhibit A, Dr. Goldsmith reports that Max evidences a significant family history of mental illness, substance abuse and trauma. Max reported a history of experiencing auditory hallucinations (hearing voices), feelings of depression, difficulties controlling anger and impulsive behaviors since early childhood. He told Dr. Goldsmith that at age 9, he was cutting himself. He described episodes of banging his head on the wall and making suicide threats, among a host of behaviors.

Ms. Slade reported that Max Nieves' great-grandmother was a drug addict. She told Dr. Goldsmith that Max's grandmother had psychiatric problems, was a drug addict and was in and out of jail. His mother had significant substance abuse problems. His father, Israel Nieves evidenced significant substance abuse problems and was in and out of jail and was physically abusive to Max.

When Max came to live with Ms. Slade and her husband, she relocated from Peekskill to Cortlandt Manor, New York, so that she could live in a better school district for Max. But because Max a great deal of difficulty focusing on his schoolwork and controlling his aggressive impulses, she brought him to the Andrus Children's Center where he received outpatient

psychiatric treatment. The PSR documents that Max was diagnosed by the Andrus Children's Center with Intermittent Explosive Disorder and cannabis use. PSR ¶ 66.[6]

At the Andrus Children's Center, Max was prescribed the antipsychotic and mood stabilizing medication, Risperdal, the antidepressant medication, Zoloft, and the psychostimulant, Ritalin and was diagnosed with a bipolar disorder. Max had his first psychiatric hospital contact when on August 6, 2008, at the age of nine he was admitted to the Four Winds Partial Hospitalization Program. The record documents that Max was brought in by Minerva Slade for treatment of "*aggressive behavior and verbally abusive*."

The medical records document the following History of Present Illness:

Medical records documents that Max was diagnosed with a mood disorder and trauma-induced reactive attachment disorder. Medications were adjusted and he was discharged on September 3, 2008, in a more stable mood.

Max's first inpatient psychiatric admission occurred in May 2009, when he was admitted to Four Winds Hospital. Hospital records document the following History of Present Illness:

> "*This is a 10-year-old male who was accompanied by guardians and father for evaluation. The patient reportedly has been increasingly labile. He has been increasingly agitated, irritable. The patient had a tantrum over the weekend and aunt had to call police for assistance. He was brought to Westchester Medical Center (WCMC) but was released due to bed unavailability. He stayed with biological father overnight and this morning started to have tantrums again, cursing at father and when father was driving patient to therapist, patient tried to jump out of car. When he arrived to the therapist's office, the patient trashed office and ran out. Police had to be called again. As per guardian, the patient appeared to become more agitated with recent medication changes. The patient had made threats to hurt self, more aggressive towards aunts and uncle.*"

While hospitalized, psychological testing revealed a full-scale IQ of 81 placing him in the bottom of the low average range of intellectual functioning. The psychologist in his report documents that Max produced a profile of someone with significant difficulty processing information. As noted by Dr. Goldsmith, his difficulty impacts his capacity to learn, but also negatively impacts his capacity to process social cues and think abstractly. The record documents that Max was discharged to the Pleasantville Cottage for residential psychiatric and educational treatment. His discharge diagnoses were mood disorder and attention deficit hyperactivity disorder, not otherwise specified. The Four Winds records also document that Max had a subsequent psychiatric admission on December 11, 2009, for similar emotional and behavioral dyscontrol.

---

[6] Max reported to Dr. Goldsmith at page 20 of his report that he began smoking marijuana when he was 12 years old.

9

A review of the records from the Mount Pleasant Cottage School, UFSD, documents in an October 31, 2011, Community and Special Education Note, that Max was placed in its program for residential education treatment because of hyperactivity and behavioral problems. The education records document that Max was next admitted to a psychiatric hospital on March 5, 2012 for continued emotional and behavioral problems. This time, Max was admitted to the Stony Lodge Hospital for psychiatric treatment. The Four Winds Hospital record also documents a later admission on March 31, 2014.

Medical records note that past hospitalizations are documented in the record as Four Winds April 2009, May 2009, December 2009, and May 2012, and Stony Lodge hospitalized twice in 2012. Max was discharged from Four Winds on April 15, 2014, with a diagnosis of impulse control disorder, not otherwise specified and cannabis dependence. Max was discharged from Four Winds back to the custody of Minerva Slade on the antipsychotic and mood stabilizing medication, Zyprexa.

Max reports that in the past he had been prescribed the antipsychotic mood stabilizing medication, Risperdal, the antidepressant medication, Zoloft, and the psychostimulant Ritalin for bipolar disorder and attention deficit disorder symptoms. The PSR documents that a review of the Andrus Children's Center record shows that Max was off his psychiatric medication in April 2017. PSR ¶ 66.

The PSR further notes that according to an intake evaluation dated April 11, 2017, Max presented as aggressive and paranoid throughout the interview. He reported that he needed help with his anger as well as medication for his mood and ADHD. PSR ¶ 66.

PSR ¶ 67 states that in September 2017, a treatment note indicated that Max was being transferred to the Orchard School at Andrus, which is a residential treatment program, as a result of his increased hostility while in session such as kicking the walls and running out of the building to the extent that the police had to be called, making it not safe for him to be seen in an outpatient setting.

Max explained that he did not always take his prescribed medications because they made him feel "dopey" and caused muscle spasms. PSR ¶ 68.

What is abundantly clear is that Max suffers from long-standing, severe emotional, behavioral and family issues that have led to multiple psychiatric hospitalizations and placements at residential treatment and educational facilities.

At age 16, he was arrested for the first time and incarcerated for 6 months at the adolescent unit on Rikers Island. While there, he reportedly received psychiatric treatment and had a good relationship with his treating psychiatrist at the Rikers Island correctional facility. It was also at the age of 16 that Max fathered his first child.

Max reported to Probation that he first smoked marijuana at the age of 9.

PSR ¶ 76; however, he told Dr. Goldsmith that he first smoked marijuana at age 12. Regardless, it is clear that Max began to smoke marijuana at an early age and smoked in persistently. He also has abuse Xanax and he told Dr. Goldsmith that in the past he has abused promethazine and codeine cough medication, drinking the street preparation "Lean." He also said that he has smoked K2.

Given his psychiatric history and struggles, self-medicating is neither unusual nor surprising.

Given this troubled background, Max has made taken significant strides in attempting to rehabilitate himself and control his behavior.

During the course of an interview with Dr. Goldsmith, conducted by video on July 1, 2020, Max reported that he now "understands that his mental condition is better when he is sober." He told Dr. Goldsmith that cannabis makes him "lazy" and that "I want to do better for myself." He disclosed that cannabis makes him feel "depressed" and he now realized that he functions better when marijuana. He told Dr. Goldsmith that giving up smoking cannabis is "part of growing up."

Dr. Goldsmith writes:

> "When Max Nieves was first incarcerated at the Westchester County Jail for this crime, he evidenced auditory hallucinations, paranoid thinking, extreme mood swings with affective instability and psychotic agitation. However, with jail-based treatment Mr. Nieves' mood condition has stabilized. He evidences diminished paranoia, hallucinations and mood swings with accompanying significant improvement in his behavioral control.
>
> Max Nieves can benefit from continued psychiatric treatment inclusive of mood stabilizing antipsychotic medications, skills building psychotherapy and vocational training, and counseling to assist Max in maintaining sobriety. Comprehensive psychiatric treatment will assist Mr. Nieves in solidifying the development of healthy coping strategies and support his engagement in productive activities."

See Exhibit A at page 1.

**B. Letters from Max's Family Offer Insight**

In a series of letters attached hereto as Exhibit B, Max's family members offer insight into who he is and who he is capable of being.

Ms. Slade, his "mother" and guardian, offers a candid and insightful letter regarding his tragic past and his mental health issues. She writes, in pertinent part:

> "…As many mental health patients he thought he could handle his mental health problem. But of course he could not. During this time, he became a father of 2 children. He is loving father. He realizes the impact of his absence on his children. He does not want to abandon his children as his parents did to him.
>
> His arrest has made Max realized the impact of his crime and he is committed to change his life. His children need him. He also realizes that he needs help to heal from his mental health disease.
>
> We as a family will be supporting Max when he is released from prison. We will provide a home and have available a Mental Health Program in the community so he can immediately enter into treatment.
>
> …We raised Max in a Christian home and values. Our family understands that we have a responsibility to help Max to get help for his mental disease and become a productive member of his community. He has great role models in our family that are willing to help him. We are committed to helping him become a good member of the community."

His Aunt Julia Olivo Rodriguez, writes, in pertinent part:

> "…I believe that Max was beginning to understand how important it was for him to be present in his children's lives before he was incarcerated. He has a sincere desire to be near in his sons' lives and understands how his involvement can help them not make the same mistakes he has made.
>
> …As his aunt, I am committed to help Max and his children… Max does have a foundation rooted in family love and support for one another. I know that he will grow that foundation with his own children because I know how deeply he cares for his boys.
>
> I hope that you will consider these words of support for my nephew and recognize that he can turn his life around for the better."

Additional letters setting forth similar sentiments are contained in Exhibit B.

## CONCLUSION

We do not excuse Max's actions based upon his background and psychiatric illness. Max pled guilty and accepted responsibility for his actions. Rather, we point out – as this Court has seen on hundreds of occasions – the impact that these factors have had on this young man in an effort to contextualize his conduct.

These factors, now explained more in depth, lend significant credence to the reasons why we submit that Max Nieves – a 22 year-old man, loving father of two toddlers – deserves a sentence of Time Served.  We submit that there is no appreciable reason to require that Max serve a sentence of 36 months, which Probation recommended in the PSR nearly one year ago and *prior to* the pervasive and destructive impact that COVID has had on Max's conditions of confinement.

Upon his release from prison, Max intends to reside with Samantha Roman and their children.

At page 20 of the PSR, it reads:

"…The defendant has never been married and has two children with his longtime girlfriend, whom he intends to reside with upon his release.  As reported by the defendant's girlfriend and aunt, Nieves is a great father.

Nieves is reportedly in good physical health. He has previous mental health diagnoses of PSTD, ADHD, ADD, Bipolar Disorder, Schizophrenia, and Anxiety.  His first diagnosis was at the age of seven.  He has attended numerous inpatient and outpatient treatment facilities.  Treatment records indicate that Nieves would often become hostile and violent throughout sessions.  As reported by the defendant he has been prescribed medication in the past; however, did not take it because of the adverse reactions he experienced.  He was last on medication approximately four years ago. The defendant's aunt informed that the defendant can do well if he is under the care of a mental health professional.  She noted many years of success while Nieves was attending mental health treatment; however, as he grew older, it became harder to manage his diagnosis."

We submit that Mr. Nieves would greatly benefit from ongoing mental health treatment and appropriate medication.  He has already demonstrated significant progress. Max was arrested on May 15, 2019 and has been in continuous custody since that date.  On the date of sentence, he will have already been incarcerated for 21 months.  If the Court chooses to impose a sentence of Time Served, then there will have occurred a significant period of time in which the punitive goal of sentencing will have been accomplished while at the same time, and given all of the factors discussed above, other goals of sentencing such as rehabilitation and deterrence can be achieved by requiring psychiatric counseling while on supervised release.  We submit that such a sentence would be a "reasonable" one pursuant to 18 U.S.C. § 3553(a).  As noted, given Max's mental health issues, diminutive physical size, developing sense of maturity and response to medication, coupled with how the pandemic resulted in conditions of confinement that were far harsher than "normal," are all additional reasons to grant the variance sought here.

We submit that a sentence of Time Served, followed by a period of supervised release with conditions discussed herein, would be sufficient but not greater than necessary to punish him for his actions, deter him and others, protect society, and achieve the goals of sentencing. It would also be just and reasonable given the perils which an asthmatic defendant faces while

13

incarcerated in the BOP system as well as reflect the unduly harsh conditions of confinement under which Mr. Nieves has been incarcerated during the pandemic.

                                    Respectfully submitted,

                                    <u>Daniel S. Parker</u>
                                    Parker and Carmody, LLP
                                    30 East 33rd Street
                                    6th Floor
                                    New York, NY 10016
                                    917-670-7622
                                    DanielParker@aol.com

Cc:  AUSA Courtney Heavey
      AUSA Jennifer Ong (By ECF and email)